SOUTHERN BELLE, The (CULBERTSON v.). See Case No. 3,462.

SOUTHERN EXPRESS CO. (BLAND v.). See Case No. 1,526.

SOUTHERN EXPRESS CO. (CALDWELL v.). See Case No. 2,303.

SOUTHERN EXPRESS CO. (ST. JOHN v.). See Case No. 12,228.

---

## Case No. 13,187

### The SOUTHERN HOME.

[16 Blatchf. 447;[1] 8 Reporter, 389.]

Circuit Court, S. D. New York. June 30, 1879.

#### COLLISION—INEVITABLE ACCIDENT—LOOKOUT—DISABLED CREW

1. A vessel bound to keep out of the way of another vessel, and having no lookout, was, in this case, held to be not in fault for a collision between the two vessels, because the case was one of inevitable accident.

2. The yellow fever having disabled most of her crew, which was adequate, it was proper for her to pursue her voyage, without putting back or seeking an intermediate port or anchoring, her precautions, with the remaining crew, being reasonable.

This was an appeal from a decree of the district court, dismissing the libel, in a suit in rem, in admiralty. This court found the following facts: "About four o'clock in the morning of the 22d of September, 1875, a collision occurred between the German bark Bremen, owned by the libellants, and the British schooner Southern Home, three or four miles to the eastward of the light ship, off Sandy Hook. The Bremen was bound on a voyage from Bremen to New York, and the Southern Home from San Domingo to New York. The wind was somewhat west of north, and both vessels were beating in to New York, the Bremen being on her starboard and the Southern Home on her port tack. Both vessels were steering by the wind, and close hauled. The weather was fine, and the moon shining brightly. The sea was tolerably smooth, and the wind steady, at a five or six knot breeze. Both vessels had their regulation lights set and burning brightly. The Bremen was well manned and found, and her lookout, who was on duty, discovered the green light of the Southern Home off his port bow, when the vessels were a long distance apart. He promptly reported it, and the Bremen was kept steadily on her course. There was no fault whatever in her navigation. She had taken a pilot on board about noon of the previous day, to bring her into New York, and he was, at the time, in charge. The Southern Home left San Domingo on the 31st of August. She was staunch, strong and well equipped. Her crew consisted of eight men, all told, to wit, the captain, first and second mates, three able seamen, one ordinary seaman, and a steward. This was sufficient. The steward was not well when the vessel sailed and off duty, but he kept around until about half an hour after they got over the bar, when he went to his bunk. When the vessel was well outside and had everything set, the captain left the wheel and went below, to see him. He appeared to have a fever, but the captain did not then know it was yellow fever. It afterwards proved to be such, and the steward died the seventeenth day out. The ordinary seaman was taken down the evening after the vessel sailed, and the captain the day after. On the fourth day out, two of the able seamen were taken, and, on the 13th of September, the mate. The last seaman was attacked the day after the steward died. The disease was yellow fever. The second mate was then the only well man on board, and he navigated the vessel alone and in safety until the night of the collision. No attempt was made to put into any port on the way, or to go back to San Domingo. No vessel was signalled on the voyage, within signalling distance, and no signal of distress had been displayed. On the night of the collision, the second mate was alone on deck until about three o'clock in the morning. All sails were set, except

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

the outer jib, and the foresail had a reef in it. The second mate set the gaff topsail alone two days before. The foresail was reefed before the mate was taken sick. With the exception of the gaff topsail, all the other sails had been set a long time. About three o'clock in the morning of the 22d, the second mate, who had been thirty hours continuously on deck, navigating the vessel alone, went below and called one of the seamen, who appeared to be better than the others, to come up and steer, while he went into the cabin to get a little sleep. The man had strength enough to keep the vessel steady on her course, with the weather as it was, but could do but little more. He was instructed to call the second mate at daybreak, or before, if he saw anything, and to keep the course she was then on, steering by the wind. The second mate then went into the cabin, and lay down on the floor to sleep, about twelve feet from the man at the wheel. It was too cold to lie down with safety on the deck. The captain was in his berth in the cabin, at the time, unable to sleep on account of his anxiety about the vessel. After the second mate had been asleep about half an hour, he was awakened by a faint call from the man at the wheel, and went immediately on deck. When he got there, the man at the wheel called his attention to a vessel near by, pointing with his finger. He was too weak to speak so as to be understood. The mate went to the leeward, and saw a vessel and her red light a few lengths away, and immediately ordered the wheel to port, and ran to help put it over, as the man was too weak to do it alone. As soon as the wheel was over, he ran and let go the main sheet, but, notwithstanding this, the collision occurred. All was done that could be to avoid the accident, after the second mate came on deck, and no fault was committed. The captain heard the call to the second mate from the man at the wheel, and crawled on his hands and knees to the deck, but was too weak to sit up or render any assistance. All the men were on deck who were able to be there. The Southern Home was kept steadily on her course until the second mate came on deck. A collision was then unavoidable. The second mate heard a hail from the Bremen after he got on deck. About an hour before the collision, the vessel had reached good anchorage ground on the New Jersey coast, but, if the anchor had been let go, it could not have been raised, in case of necessity, for want of a sufficient crew. When the second mate went below there were no vessels in sight, and there was, apparently, nothing to prevent an early completion of the voyage in safety. The Southern Home struck the Bremen almost head on, at the mizzen rigging, doing much damage. After the collision, a tug was procured, and the Southern Home towed to the quarantine. All on board, except the captain, second mate and one seaman were taken to the hospital. The captain remained on board. The three seamen were discharged cured, September 30th; and the mate, October 4th. One of the men went back again October 13th, and was again discharged October 22d."

William Allen Butler, for libellants.
Robert D. Benedict, for claimant.

WAITE, Circuit Justice. There is here no dispute as to facts. The simple question is, whether, upon the facts as they are substantially conceded to be, a case of inevitable accident has, in law, been made out. As between the two approaching vessels, it was the duty of the Southern Home to keep out of the way, and the collision was, no doubt, due solely to the fact that she had no lookout. The burden of excusing this fault is on her.

It is said, by the supreme court, in the case of The Grace Girdler, 7 Wall. [74 U. S.] 196, 203, that "inevitable accident is where a vessel is pursuing a lawful avocation in a lawful manner, using the proper precautions against danger, and an accident occurs. The highest degree of caution that can be used is not required. It is enough that it is reasonable, under the circumstances." The Southern Home was pursuing a lawful avocation. She sailed from a sickly port, bound for a more healthy one, having on board what appeared to be a sufficient crew. While the steward was complaining, there was nothing in his case to indicate special danger. A vessel once out of port, with a full complement of men, is not always required to put back if sickness afterwards appears. Neither must she, under all circumstances, seek an intermediate port for relief. All such matters are left to the considerate judgment of those in command at the time, and, if they act with reasonable prudence, in reference to the preservation of life and property, they are not to be charged with fault simply because an accident afterwards happens, that might have been avoided if another course had been pursued. In this case, the vessel was bound for a northern port, where there was every reason to believe the disease with which her crew was afflicted could be treated under more favorable circumstances than at the one she had left, or any other she could have entered on her way up. That there was no absolute necessity for putting back when the sickness broke out, is shown by the fact, that the vessel was safely navigated with her disabled crew until she had almost reached her port of destination, and that only one of her crew died on the way. All those who reached New York recovered soon after their arrival. It is not reasonable to suppose that more could have been accomplished in the way of saving life, if anything else had been done. An attempt to enter another port would have exposed the vessel to dangers similar to those she encountered while approaching New

York. A collision with the Bremen would have been avoided, but another might have occurred. To my mind it is clear, that, under the circumstances, it was not a fault to continue the voyage without putting back or turning aside for relief.

The whole case, as it seems to me, depends upon what occurred at or immediately before the collision. The vessel was then nearing her port of destination. The weather was fine, the sea smooth, and the wind such as to make it easy to navigate her. This is shown by the conceded fact, that the sick man at the wheel, too weak to speak aloud and scarcely able to sit up, could keep her steady on her course. All sails were set, but they were no more than could easily be carried. All she actually needed, more than she had, was a lookout. Had there been one at his post, it is almost certain there would have been no collision. If she had anchored or hove to in that unusual place, a lookout would have been as necessary as if she had been sailing. In short, so long as she could be steered, it was nearly or quite as safe for her to go on without her lookout, as it would have been to lie still. If she had come to anchor, there was no crew to raise it, should that become necessary. But, in all cases like this, some attention must be paid to the natural instincts of mankind. The second mate, almost exhausted by his days and weeks of watching and anxiety, was where he saw relief nearly at hand. It would be inhuman to charge him with fault in keeping on instead of anchoring or heaving to, in the midst of the circumstances which then surrounded him. There was no other vessel in sight when he went below, and he left strict orders to be called if anything appeared. He was prompt to answer the call as soon as it came, and, in seeking his expected hour or two of sleep, he was but preparing himself for the more active work which would probably be required of him when he got nearer the entrance of the harbor. He displayed no signals of distress, because, until the Bremen appeared, there was no one to see them, and, when she did appear, there was no one to make the display, any more than there was to notice her light when it was near enough to be seen. When the second mate came on deck he did everything that could be done. As soon as he found out why he was called he put the wheel to port and let go the main sheet. It was not seriously contended, on the argument here, that this was wrong, or that anything else could have avoided the collision which was then imminent.

I am entirely satisfied with the correctness of the decree below, and an entry may be prepared dismissing the libel, with costs.